IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

-----------------------------------------------------------------x
: 
**In re:** :
: **Chapter 11**
**LRGHEALTHCARE,** :
: **Case No. 20-10982 (MAF)**
**Debtor.**[1] :
:
----------------------------------------------------------- x

**NOTICE OF FILING OF DISCLOSURE PURSUANT TO LOCAL BANKRUPTCY
RULE 6004-1 PERTAINING TO THE SALE OF SUBSTANTIALLY
ALL OF THE ASSETS OF LRGHEALTHCARE**

**PLEASE TAKE NOTICE** that on October 19, 2020, the Debtor filed its Motion For

Sale of Property under Section 363(b) For Orders (A)(I) Approving Procedures for Selling

Substantially All Property of the Debtor's Estate Free and Clear of All Interests, (II) Approving

Procedures for Assuming and Assigning Certain Executory Contracts and Unexpired Leases,

(III) Authorizing the Debtor to Enter Into the Stalking Horse Agreement, (IV) Authorizing the

Payment of the Stalking Horse Payment as Administrative Expenses, and (V) Granting Related

Relief; and (B)(I) Approving the Sale of Substantially All Property of the Debtor's Estate Free

and Clear of All Interests, (II) Approving the Assumption and Assignment of Certain Executory

Contracts and Unexpired Leases, and (III) Granting Related Relief [Dkt. No. 45] (the "Sale

Motion")[2]

---

[1]    The last four digits of the Debtor's federal taxpayer identification number are 2150. The address of the Debtor's headquarters is 80 Highland Street, Laconia, NH 03246.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

**PLEASE TAKE FURTHER NOTICE,** in connection with the Sale Motion, the Debtor

has filed the attached proposed Disclosure Pursuant to Local Bankruptcy Rule 6004-1.

Dated: October 20, 2020                           NIXON PEABODY LLP

                                                  /s/ Morgan Nighan
                                                  Morgan Nighan
                                                  900 Elm Street
                                                  Manchester, NH 03101-2031
                                                  Telephone: (603) 628-4000
                                                  Facsimile: (603) 628-4040
                                                  mnighan@nixonpeabody.com

                                                  -and-

                                                  Victor Milione
                                                  Christopher M. Desiderio
                                                  55 West 46th Street
                                                  New York, NY 10036
                                                  Telephone: (212) 940-3000
                                                  vmilione@nixonpeabody.com
                                                  cdesiderio@nixonpeabody.com

                                                  *Proposed Counsel to the Debtor*

## DISCLOSURE PURSUANT TO LOCAL BANKRUPTCY RULE 6004-1
## PERTAINING TO THE SALE OF SUBSTANTIALLY
## ALL OF THE ASSETS OF LRGHEALTHCARE

1.      Pursuant to Local Bankruptcy Rule 6004-1, the Court has determined that this Exhibit is the functional equivalent of a disclosure statement with respect to the proposed sale of substantially all of the assets of LRGHealthcare (the "Debtor" or "LRGHealthcare") pursuant to Section 363 of the Bankruptcy Code.[3]  Additional information concerning the Debtor, its business and the Chapter 11 Case can be found in the Debtor's Voluntary Petition, Statement of Financial Affairs, Schedules, and Declaration of Kevin W. Donovan in Support of the First Day Motions, which were executed under oath and are available to the public.  All pleadings are available to the public, at no charge, as the Debtor's Noticing Agent's website at:

https://dm.epiq11.com/lrghealthcare.

2.      This Disclosure contains information about the Debtor and the Sale, which is intended to provide creditors with adequate information to an informed decision when deciding whether to support or object to the Sale Motion or choose not to take any position. **Your rights may be affected. You should read this Disclosure and the Sale Motion carefully and discuss them with your attorney.** If you do not have an attorney, you may wish to consult one. If approved, the Sale Motion will be binding on all creditors, counterparties to Assumed Contracts and other parties in interest.

---

[3] `All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Debtor's Motion for Orders (A)(I) Approving Procedures for Selling Substantially All Property of the Debtor's Estate Free and Clear of All Interests, (II) Approving Procedures for Assuming and Assigning Certain Executory Contracts and Unexpired Leases, (III) Authorizing the Debtor to Enter Into the Stalking Horse Agreement, (IV) Authorizing the Payment of the Stalking Horse Payment as Administrative Expenses, and (V) Granting Related Relief; and (B)(I) Approving the Sale of Substantially All Property of the Debtor's Estate Free and Clear of All Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief (the "Sale Motion") which is fully incorporated herein by reference.

3.      Except as otherwise disclosed herein, this Disclosure is based on the information available to the Debtor of the Petition Date. The Debtor believe that based on its circumstances, assets, and future income described below, the Sale Motion is in the best interest of all Creditors, and the Debtor recommends that creditors support the Sale Motion.

**I.**

**BACKGROUND**

**FOUNDATION OF LRGHEALTHCARE**

4.      LRGHealthcare is a not-for-profit healthcare charitable trust operating Lakes Region General Hospital ("LRGH"), Franklin Regional Hospital ("FRH"), and numerous other affiliated medical practices and service programs.  LRGH is a community based acute care facility with a licensed bed capacity of 137 beds, and FRH is a 25-bed critical access hospital with an additional 10-bed inpatient psychiatric unit.  In 2002, Lakes Region Hospital Association and Franklin Regional Hospital Association merged, with the merged entity renamed LRGHealthcare.

5.      The Lakes Region communities served by LRGHealthcare include Laconia, Gilford, Alton, Ashland, Barnstead, Belmont, Center Harbor, Gilmanton, Meredith, Moultonborough, New Hampton and Sandwich.  In the Three Rivers Region, LRGHealthcare serves the communities of Franklin, Tilton, Northfield, Sanbornton, Alexandria, Andover, Bristol, Bridgewater, Boscawen, Danbury, Hebron, Hill and Salisbury.

6.      LRGHealthcare offers a wide range of medical, surgical, specialty, diagnostic, and therapeutic services, wellness education, support groups, and other community outreach services. Emergency Services are available twenty-four hours a day at FRH and LRGH, and the emergency department is staffed with specially trained physicians, nurses and allied staff,

supported by various diagnostics.  The Debtor is also equipped to provide ground and air transfer to tertiary care facilities.

7.      LRGHealthcare employs approximately 1,401 full and part-time employees.  In 2019, LRGHealthcare serviced approximately 3,917 inpatient admissions, 33,803 emergency room visits, and approximately 260,000 outpatient visits.  The organization has up to 172 licensed beds and the capability to serve patients with various physical and mental health issues. In 2019, LRGHealthcare had net patient revenues of almost $206 million and an operating loss of approximately $20 million.

## THE DEBTOR'S BUSINESS

8.      From primary care and surgical services to oncology care, LRGHealthcare provides the latest healing techniques and technology delivered by very caring and compassionate staff.

## A.      EMERGENCY SERVICES

9.      Both emergency departments of FRH and LRGH ensure that patients' emergent needs will be met with professional and compassionate care.  Both departments are home to specially trained physicians, nurses, and staff who make emergency medicine their priority. With state of the art diagnostic equipment, twenty-four hour, fully-equipped facilities, and transfer capability of patients via ground or air to tertiary care facilities if needed, the departments are ready for all emergent needs.

10.     FRH provides emergency services to the "Three Rivers Regions," which includes Franklin, Tilton, Northfield, Sanbornton, Alexandria, Andover, Bristol, Bridgewater, Boscawen, Danbury, Hebron, Hill and Salisbury.

3

11.    LRGH provides emergency services to the "Lakes Region," which includes Laconia, Gilford, Alton, Ashland, Barnstead, Belmont, Center Harbor, Gilmanton, Meredith, Moultonborough, New Hampton and Sandwich.

12.    All patients presenting to an emergency department are assessed and triaged by a registered nurse ("RN") and seen by an Emergency Medicine provider.  Patient care is provided using an interdisciplinary team in collaboration with Emergency Medical Services, emergency department staff, other departments within the hospital, and private physicians. Emergency nurses maintain certifications in Basic Life Support ("BLS"), Advanced Cardiac Life Support ("ACLS"), Trauma Nursing ("TNCC"), and Pediatric Advanced Life Support ("PALS").  Each of the emergency departments and trauma centers have individual patient rooms with isolation/negative pressure rooms and trauma bays.  A comprehensive renovation of the emergency room at LRGH was undertaken in 2018 and 2019, at a total cost of approximately $7 Million, providing a state of the art, best practice facility, fully funded by private donations.

## B.    CRITICAL CARE

13.    Patients who need continuous monitoring and observation are admitted to the Intensive Care Unit ("ICU") at LRGH, or will be transported to another available ICU.  The ICU at LRGH is a 20 bed unit, with beds reserved for inpatient dialysis, surgical recovery and other critical care patients.

14.    At FRH critically ill or injured patients are cared for by the Debtor's emergency care team until they are stable enough to be transferred to an available ICU.

## C.    MENTAL HEALTH SERVICES

15.    FRH also has a Designated Receiving Facility ("DRF"), a twenty-four-hour inpatient mental health unit.  Admissions come from emergency departments all over the state of

New Hampshire.  Patients may be admitted for a voluntary or involuntary examination if there is

reason to believe that he/she is mentally ill, they are a serious danger to his/her self or others, or

they are likely to suffer from neglect or harm if the current behavior continues.  LRGH offers

twenty-four hour emergency psychiatric care through a round-the-clock call system with Lakes

Region Mental Health Center providers.

16.     The LRGHealthcare Recovery Clinic (the "Recovery Clinic") provides substance

use disorder services at both FRH and LRGH.  The Recovery Clinic works in concert with the

"Doorway" at LRGH, which is one of the nine "Doorways" in the State of New Hampshire.  The

Doorway program is one that is changing how New Hampshire helps people with an opioid use

disorder ("OUD") or other substance use disorders ("SUD").  The Doorways provide single

points of entry for people seeking help for substance use, whether they need treatment, support,

or resources for prevention and awareness.  The regional Doorways ensure that help is always

less than an hour away.  New Hampshire's Doorway program receives funding from the U.S.

Substance Abuse and Mental Health Administration - State Opioid Response ("SOR") grant.

This federal support is enabling New Hampshire to expand medication-assisted treatment

("MAT"), peer recovery services, access to recovery housing, evidence-based prevention

programs, workforce opportunities and training and education.

D.     **MEDICAL/SURGICAL UNITS**

17.     FRH contains two distinct nursing units: the DRF and 2 South.  2 South can

accommodate up to twenty-five medical inpatients.   On any given day, there are approximately

sixteen patients receiving coordinated, compassionate, individualized care at 2 South.  These

patients fit into a general medical or skilled nursing level of care.  All services are provided in a

customer friendly atmosphere which provides both patients and families the support they need. The unit functions on a twenty-four hour per day basis.

18.     LRGH contains six distinct nursing units: the ICU, East 1, North 2, North 4, South 3, and Senior Psychiatric Services ("SPS").

19.     East 1 is a twenty bed unit with private rooms and a centralized nursing station. The major focus of this unit is providing quality comprehensive care to acutely ill patients with surgical and medical problems.

20.     North 2 is a fourteen bed unit with private rooms and a centralized nursing station. The major focus of this unit is providing quality comprehensive care to acutely ill patients with medical problems.

21.     North 4 is a fifteen bed unit with private rooms and a centralized nursing station. The major focus of this unit is providing quality comprehensive care to acutely ill patients with medical and surgical problems.

22.     South 3 is a ten bed unit with private rooms and a centralized nursing station.  The major focus of this unit is providing quality comprehensive care to acutely ill patients with orthopedic problems.

23.     SPS is an eight bed unit with private rooms and a centralized nursing station.  The major focus of this unit is providing quality comprehensive care to geriatric psychiatry patients with various diagnoses including Alzheimer's and dementia.

**D.     CANCER CENTER AND ONCOLOGY PROGRAM**

24.     The Anderson Ganong Cancer Center ("AGCC") located in Laconia, NH provides exceptional care with a personal touch; a place to call home that's close to home; and a family of

compassionate, dedicated individuals who are passionate about caring for and supporting patients during a challenging time of life.

25.     LRGHealthcare offers, among other things, services from top oncologists from New Hampshire Oncology–Hematology, PA, chemotherapy, blood-related disorder treatments, medical imaging, surgical services, an on-site pharmacist, and wound care.

**E.     OUTPATIENT CLINICS AND PROVIDER PRACTICES**

26.     LRGHealthcare offers a number of outpatient clinics and provider practice sites to the communities served.  The practice sites in multiple communities offer primary care, women's health, pediatrics, medical specialty, surgical specialty, orthopedics, sleep medicine and other outpatient services.   LRGHealthcare is the primary provider of health services such as these in the local community, which otherwise would not have such access within a 45 minute drive.

**F.     QUALITY**

27.     LRGHealthcare's dedication to excellence has resulted in recognition as an ISO 9001 Quality Management System Certified organization.  This certification reflects LRGHealthcare's long-term commitment to quality, safety, and patient satisfaction.  This achievement was no small feat as the journey to ISO 9001 Certification began in 2015 and culminated in 2018.  With this certification, LRGH and FRH are part of an elite group of hospitals nationwide that have achieved ISO 9001 status.  The certification is valid for three years and is provided by DNV GL – Business Assurance, part of the DNV GL Group, a world-leading certification body known for its safety and efficiency standards.  To achieve certification, in addition to accreditation, an organization must develop a series of systematic, standardized processes which are constantly reviewed and revised to assure a high level of quality and safety.

## II.

## THE DEBTOR'S CAPITAL STRUCTURE

**A.      2009 BOND TRANSACTION FHA INSURED MORTGAGE REVENUE BONDS**

31**.**      On December 9, 2009, LRGHealthcare refinanced its then outstanding Series 2006 Bonds in the amount of $37,110,000 and its then outstanding Series 2008 Bonds in the amount of $34,405,000, and borrowed additional amounts for capital projects, through the issuance of $143,520,000 in fixed rate Federal Housing and Urban Development Insured Mortgage Revenue Bonds with an average rate of 5.52%.  The Series 2009 Bonds were issued pursuant to the New Hampshire Health and Education Facilities Authority Act, Chapter 195-D of the New Hampshire Revised Statutes Annotated, as amended (the "Act"), and the Bond Resolution of the New Hampshire Health and Education Facilities Authority (the "Authority") and a Bond Trust Indenture, dated October 1, 2009, by and between the Authority and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Bond Trustee").  The proceeds of the Series 2009 Bonds were loaned by the Authority to LRGHealthcare pursuant to a Loan Agreement, dated as of October 1, 2009, by and between the Authority and LRGHealthcare.  The obligations of LRGHealthcare were evidenced by a Mortgage Note, dated as of December 9, 2009 (the "Mortgage Note") from the Debtor to the Bond Trustee.  The Department of Housing and Urban Development ("HUD"), acting by and through the Federal Housing Commissioner ("FHA"), insured the advancement of funds pursuant to Section 242 of Title II of the National Housing Act, as amended.  As part of this transaction LRGHealthcare entered into a FHA Regulatory Agreement with the Bond Trustee and certain other documents delivered to FHA and the Bond Trustee, as beneficiary (the "Regulatory Agreement").  Additionally, as part of this transaction LRGHealthcare entered into a Security Agreement with the Bond Trustee and HUD

dated as of December 9, 2009 (the "Security Agreement") granting a security interest in all assets

but excepting and excluding therefrom all current or future (collectively the "Excluded Assets"):

      a.      donations specifically restricted by donors, (but only so long as they remain restricted by the donors);

      b.      various pieces of leased or financed equipment;

      c.      any equipment to be acquired by LRGHealthcare subject to purchase money security interests; and

      d.      certain excluded real property (identified herein as the Unencumbered Additional Real Property).

32.      The proceeds of the Mortgage Note were used to refinance the prior mortgage

debt and to fund approximately $51 million of new capital improvements to LRG and FRH.  In

2012, following completion of construction of the Debtor's new improvements and the

completion of HUD's cost certification, the final closing of the Mortgage Loan occurred. At that

time a Second Allonge to the Mortgage Note was entered primarily to reflect the reduced amount

of the Mortgage Loan to reflect payments made prior to that date, and, then, a Third Allonge to

the Mortgage Note was entered to correct arithmetical errors in the Second Allonge.

33.      In September 2015, in order to reduce the interest rate on the Mortgage Note and

to reduce the monthly amortization payments, LRGHealthcare agreed to a defeasance of the

Series 2009 Bonds through the refinancing of the Mortgage Note.  The defeasance of the Series

2009 Bonds was initiated at this time by the deposit of sufficient funds to provide for payment in

full of the Series 2009 Bonds in 2019 (the first date such bonds could be voluntarily repaid) into

a refunding escrow deposit account established pursuant to that certain Refunding Escrow

Deposit Agreement dated as of September 30, 2015 by and between the Authority, the Bond

Trustee and LRGHealthcare (the "Refunding Escrow Deposit Agreement").  Pursuant to the

Refunding Escrow Deposit Agreement, $159,275,353.04 was deposited into the refunding escrow deposit account, comprised of (i) funds in the amount of $17,189,515.69 previously held by the Bond Trustee under the Bond Indenture, and (ii) funds in the amount of $142,085,837.35, comprised of $125,871,960.19 in proceeds from the Pre-Petition Lender, $629,359.80 in proceeds from a good faith deposit by the Debtor to the Pre-Petition Lender, plus $15,584,517.36 in proceeds from the Debtor.  As part of this transaction, the Mortgage Note and the Security Agreements were assigned to the Pre-Petition Lender.   The purpose of this transaction was to reduce the then-existing debt service payments.  The proceeds of the Pre-Petition Lender's loan were deposited into an escrow account established by the Refunding Escrow Deposit Agreement and used to service the existing Series 2009 Bond obligations and to redeem the Series 2009 Bonds in October of 2019.

**B.      CONDO MORTGAGE**

28.      On or about February 21, 2019, LRGHealthcare purchased a certain condo unit from a physicians' practice for $475,000.77 according to a long standing legal agreement which set the purchase price.  LRGHealthcare paid $238,000.77 to the seller at closing and provided a note to OB-GYN Realty Company, LLC which is secured by the condo unit that matures on February 21, 2021.   The current balance of the mortgage is approximately $51,500.00.  The condo is currently used to support some of the Debtors' back office functions and does not generate any revenue.

**C.      PURCHASE MONEY SECURITY INTERESTS**

29.      Several of the Debtor's vendors may assert various liens on certain of the Debtor's assets and inventory. The Debtor estimates that these vendors may assert secured claims of approximately $1.5 million in the aggregate.

**D.     STATE OF NEW HAMPSHIRE LOAN**

30.     On or about March 13, 2020, Governor Christopher T. Sununu declared a State of Emergency as a result of the COVID-19 pandemic.  Pursuant to Section 18 of the emergency declaration, the Governor issued Emergency Order #9 on March 19, 2020, creating the COVID-19 Emergency Healthcare Relief Fund (the "Relief Fund") and authorizing the New Hampshire Department of Health and Human Services (the "NHDHHS") to develop application and evaluation criteria and to distribute relief from the Relief Fund.

31.     LRGHealthcare applied for relief from the Relief Fund which was approved by the DHHS. As a result, on or about April 8, 2020, LRGHealthcare and NHDHHS entered into that certain Loan Agreement and Note (the "Relief Loan") in the principal amount of $5,250,000.00.  The Relief Loan matures 180 days after the expiration of the State of Emergency and is unsecured.  At the NHDHHS's discretion, and with the approval of the Governor, the Relief Loan may be converted to a grant and forgiven, contingent upon (a) the use of the Relief Loan for the purposes set forth in the Debtor's application, (b) verification of the need for a grant, (c) ineligibility of the Debtor to borrow or otherwise receive funds from other public sources and (d) continued financial hardship.

**E.     CARES ACT FUNDING**

32.     On or about March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  Among other things the CARES act provided more than $100 billion for hospitals and healthcare providers and $27 billion in funds for vaccines, therapeutics, and personal protective equipment (the "CARES Relief Fund"). These funds were administered by the U.S. Department of Health & Human Services ("USDHHS"). Funds received from the CARES Relief Fund were earmarked to only be used to prevent, prepare

for, and respond to COVID-19, and shall reimburse the Recipient only for health care related

expenses or lost revenues that are attributable to COVID-19.  In the months of April and May

2020, the Debtor received multiple payments totaling approximately $15 million from the

CARES Relief Fund. Although such funds are technically a grant, the USDHHS reserves the

right to assert claims for such amounts in the event a borrower fails to properly validate the use

of the funds in accordance with the CARES Act.

### III.

### EVENTS LEADING TO THE CHAPTER 11 CASE

a.  Legislative, Regulatory and Contractual Matters Affecting Revenue

33.     The Debtor has experienced a tumultuous five to ten years, all beginning with

decisions by prior management to make significant investments in inpatient services and

facilities at a time when patient demographics and medical trends indicated more reliance on

outpatient services and decreased hospital use.  Soon thereafter, the Debtor found itself caught in

a downward spiral of increasing costs, decreasing reimbursement, shrinking service lines and

volume "leakage" to other communities.  A primary driver of cost growth was the

implementation of a massively expensive electronic medical record  system which ultimately

consumed approximately nine percent of total organizational revenue annually (two to three

times the industry average).

34.     With increasing stress on finances and direction from its lender (KeyBank) and

mortgage note insurer (HUD), LRGHealthcare under took a series of turnaround efforts to

decrease costs.  Prism Healthcare Partners, Kaufman Hall and Quorum Health Resources, all

large, nationally recognized health care consulting firms, were engaged to cut costs and improve

the bottom-line, all of which resulted in reductions in the scope of services and level of care

available at the Debtor.  Costs were greatly decreased, full-time-equivalent (FTE) employees were cut dramatically, benefits were reduced, contracts severed and physician and provider groups negatively impacted. Despite cutting 21% of its workforce since 2016 and closing multiple service lines (obstetrics at LRGH, surgical services at FRH, vascular surgery and others), the organization found, as many healthcare organizations do, the extensive cost cuts did not result in profitability or sustainability.

35.     Ultimately, the LRGHealthcare's Board of Trustees and Leadership sought a partner to bring stability to the organization, grow service lines to assist with revenue growth, and further decrease overhead costs.  In June 2018, LRGHealthcare engaged Kaufman Hall to provide advisory services and lead an exhaustive sales process.  The LRGHealthcare's Board of Trustees determined the interests of LRGHealthcare and fulfillment of its community- and patient-focused mission would be best realized through integration into a larger health system in order to ensure both operational and financial sustainability in the near- and long-term.  To accomplish this directive, the board established an Affiliation Subcommittee to direct the strategic partnership solicitation process.

36.     These efforts led LRGHealthcare to reach out to 43 potential partners and which resulted in five non-binding indications of interest in 2018.  Due diligence led one partner to rescind its offer in October 2018 and a second withdrew from the process shortly thereafter. A third informed LRGHealthcare it was no longer interested in March 2019.  After due diligence, the most viable initial offer was significantly reduced and was reliant on Debtor's lenders agreeing to accept below par payments on the outstanding mortgage and other liabilities. Unfortunately, the Debtor's lenders rejected the concept of a below-par offer when approached. The 10-month strategic partnership solicitation process, in which a comprehensive list of

potentially buyers was exhausted, ultimately concluded without an interested bidder, leaving the Debtor in a financially and operationally unsustainable position.

37.     Despite those obstacles, the Debtor continued to seek a potential partner after that process. Eventually, Debtor entered into a proposed purchase agreement with Concord Hospital to purchase substantially all of the Debtor's assets.

38.     The majority of bidders approached cited LRGHealthcare's large debt-load as the rate-limiting issue when it came time to place a bid or move forward in the process.  Despite those obstacles and after further marketing and solicitation efforts, LRGHealthcare eventually entered into a proposed purchase agreement with Concord Hospital to purchase substantially all of the Debtor's assets.

39.     Due to the COVID-19 pandemic, however, the Debtor was forced to cease all elective, non-emergent work, decreasing organizational revenues within a matter of weeks by 60% or more. With less than three days' cash on hand when the pandemic hit, the Debtor had to identify and receive financial support within weeks or close its doors permanently.

40.     To address the situation, salaries of the leadership team were reduced by 20% for a period of time and the leadership team was reduced from seven members to six members, representing a further reduction from the initial ten-member leadership team at the time that the Debtor engaged its current CEO.

41.     With the aid received from the Relief Fund and CARES Relief Fund and with a massive furlough and closure of programs and services on April 10, 2020, the Debtor managed to keep the doors open.   Without further relief, closure was otherwise imminent.  Today, the Debtor is still operating at approximately 80 percent of pre-pandemic revenue, forcing

14

management to keep certain services closed and approximately 38 percent of the pre-pandemic workhours on furlough or reduced workhours.

**IV.**

**THE PROPOSED SALE**

42.     The Debtor seeks to complete a sale (the "Sale") of substantially all of its assets pursuant to the terms of an agreement (the "Stalking Horse Agreement") by and between the Debtors and Concord Hospital and certain subsidiaries of Concord Hospital (the "Buyers"), a copy of which is attached to the Sale Motion as Exhibit C.  The following description of the Stalking Horse Agreement is intended solely to provide a brief overview thereof and to highlight material terms and provisions.  Interested parties should refer to the Stalking Horse Agreement to review the complete terms thereof. In the event of any inconsistencies between this summary and Stalking Horse Agreement, the Stalking Horse Agreement itself shall govern.

     a.     <u>Purchase Price</u>: The purchase price of the Acquired Assets shall be Thirty Million Dollars ($30,000,000.00), subject to the terms, conditions, and adjustments stated in the Stalking Horse Agreement (the "Purchase Price"). The Purchase Price shall consist of: (i) the Deposit; plus (ii) an amount required to conduct the orderly wind-down or dismissal of the Bankruptcy Case after the Closing, not to exceed five hundred thousand dollars ($500,000.00) (or as otherwise approved by the Stalking Horse in its sole discretion); plus (iii) the Hired Employee PTO, plus (iv) an amount (the "Cash Purchase Price") equal to the total Purchase Price minus items (i)-(iii).

     b.     <u>Adjustments to Purchase Price</u>. The amount of the purchase price is subject to certain adjustments including an adjustment that will result in an (i) increase by the amount, if any, that eighty percent (80%) of the net book value of the accounts receivable exceeds Fifteen Million Dollars ($15,000,000); or (ii) decrease by the amount, if any, that Fifteen Million Dollars ($15,000,000) exceeds eighty percent (80%) of the net book value of the accounts receivable.

     c.     <u>Outside Closing Date</u>: On or before March  31, 2021 or such later date as the Buyers shall have established by written notice to the Debtor.

     d.     <u>Acquired Assets</u>: Include, without limitation, the following:

15

i.    all Accounts Receivable as of the Closing Date, including all of the accounts receivable and collections with respect to the Debtor's Medicare Straddle Patients (the "<u>Medicare Straddle Patient Accounts Receivable</u>") and all of the accounts receivable and collections with respect to the Debtor's Non-Medicare Straddle Patients (the "<u>Non-Medicare Straddle Patient Accounts Receivable</u>");

ii.    the Real Property described on <u>Schedule 2.1(a)</u> of the Stalking Horse Agreement;

iii.    all equipment located at the Hospitals, including that listed in <u>Schedule 2.1(c)</u> of the Stalking Horse Agreement;

iv.    all janitorial, maintenance, shop, office and other supplies, drugs, and food and other disposables owned by the Debtor as of the Closing Date ("<u>Inventory</u>");

v.    the Debtor's interests in the Assumed Contracts;

vi.    licenses, permits, registrations, and other approvals or authorizations (including pending approvals or authorizations) of Governmental Authorities, to the extent assignable, relating to the ownership and operation of the Hospitals, but limited to those licenses, permits, registrations, and other approvals or authorizations listed in <u>Schedule 2.1(f)</u> to the Stalking Horse Agreement;

vii.    all Intellectual Properties used in connection with the ownership and operation of the Hospitals, and all computer software, programs, and similar systems licensed for use in conjunction with the operation of the Hospitals, including those described in <u>Schedule 2.1(g)</u> to the Stalking Horse Agreement, to the extent assignable;

viii.    all original patient records located at, in the custody of, or electronically maintained by either Hospital which, as of the Closing Date, the Debtor is required by applicable law to retain (the "<u>Included Patient Records</u>") and personnel records for Hired Employees, and all policies and procedures manuals and quality assurance records of the Debtor to the extent relating to either Hospital;

ix.    all other books, records, files, papers, and other documents (in whatever form, including computer files and software), including all inventory; sales and marketing records; patient, customer, and supplier lists, and literature to the extent relating to either Hospital;

x.    all restricted endowment or other funds and other restricted assets received by the Debtor from donors ("<u>Restricted Funds</u>");

16

xi. all deposits, prepaid expenses, and claims for refunds, advances, prepaid lease expenses, and security deposits arising under or related to the Assumed Contracts, and rights to offset in respect thereof, other than the deposits and prepaid expenses listed in <u>Schedule 2.1(k)</u> of the Stalking Horse Agreement (the "<u>Excluded Deposits/Prepaids</u>");

xii. those Employee Benefit Plans listed in Schedule 2.1(l) of the Stalking Horse Agreement ("<u>Assumed Employee Benefit Plans</u>");

xiii. any gift, devise, or bequest under any will, trust agreement, or other instrument of transfer ("<u>Instrument</u>") paid, payable, or to become payable to the Debtor or any of its Affiliates before, on, or after the Closing Date (including, but not limited to, gifts to be made upon the occurrence of a future event that has not yet occurred and does not occur before the Closing Date), (i) whether such Instrument came into existence before, on, or after the Closing Date; and (iii) whether such Instrument was revocable or irrevocable before, on, or after the Closing Date;

xiv. all insurance claims and proceeds thereof arising in connection with property damage to the Acquired Assets occurring before the Closing Date except to the extent, in the case of proceeds, received by the Debtor before the Closing Date and expended on the repair or restoration of the Acquired Assets before the Closing Date; and

xv. general intangibles pertaining to the Hospitals, including goodwill.

Notwithstanding the foregoing, the Stalking Horse shall have the right, upon two (2) days' written notice given to the Debtor before Closing, to exclude any or all of the Acquired Assets listed above, deeming such assets to be Excluded Assets.

e. <u>Assumed Liabilities</u>: Effective upon Closing, (a) obligations of the Debtor arising on or after the Closing Date under the Assumed Contracts shall be assumed by the Buyer that is the assignee of such Assumed Contract (and no other Buyer); (b) the Assumed Employee Benefit Plans shall be assumed by the Stalking Horse (and no other Buyer); (c) vacation, holiday, and sick leave accumulations of the Hired Employees, but only to the extent listed in Schedule 5.5(a), of the Stalking Horse Agreement, and related Taxes thereon, shall be assumed by the Buyer who becomes the employer of such Hired Employee (and no other Buyer); and (d) the Debtor's obligations, if any, described in Schedule 2.3 of the Stalking Horse Agreement shall be assumed by the Stalking Horse (and no other Buyer). The foregoing are collectively referred to as the "<u>Assumed Liabilities</u>"). The value reflected by adding the Purchase Price with the Assumed Liabilities is referred to herein as the "<u>Total Transaction Value</u>".

17

f.      Excluded Assets: The following are not a part of the Sale by Stalking Horse Agreement and are excluded from the Acquired Assets:

i.      all cash and Excluded Deposits/Prepaids;

ii.     Inventory disposed of or exhausted after the Execution Date and before the Closing Date in the ordinary course of operating the Hospitals;

iii.    any of the Debtor's interests in Contracts other than Assumed Contracts;

iv.     any Employee Benefit Plans other than Assumed Employee Benefit Plans;

v.      all right, title, and interest of the Debtor in and to all current insurance policies, if any, and all insurance policies providing Tail Coverage;

vi.     any and all claims and causes of action arising under the Bankruptcy Code other than claims and causes of action related to any Acquired Asset, including Accounts Receivable;

vii.    all personnel records, other than personnel records relating to Hired Employees, and all patient records other than Included Patient Records;

viii.   all tradenames that are not described in Schedule 2.1(g) of the Stalking Horse Agreement or are described therein but are not assignable;

ix.     all Debtor's Permits that are not assignable pursuant to applicable law and pending applications therefore; and

x.      all Documents relating exclusively to an Excluded Asset.

43.     All of the Debtor's rights, title, and interest in the Acquired Assets shall be sold free and clear of any liens, security interests, claims, charges, or encumbrances pursuant to section 363 of the Bankruptcy Code.  The Debtor proposes that any such liens, security interests, claims, charges, or encumbrances shall attach to the amounts payable to the Debtor's estate resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of

priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

**V.**

**PRELIMINARY RECOVERY ANALYSIS**

44.     In the event the Stalking Horse Agreement is ultimately the prevailing bid at the auction, the Debtor anticipates the following recoveries for creditors.  This summary is provided for convenience purposes only and is subject to material modifications as the Case progresses:[4]

---

[4]    This summary is provided for informational purposes only. To the extent the Debtor seeks confirmation of a plan of liquidation, it reserves the right to revise, modify, or amend the classification of creditors or their treatment.

| Class | Estimated Claims (Approximately) | Total Distribution (Approximately) | Estimated Percentage Recovery |
|---|---|---|---|
| Administrative expense claims (including 503(b)(9) and professional fee claims)[5] | $3.5 – $4.0 million | $3.5 – $4.0 million | 100% |
| Priority Claims including wage claims at time of closing under Stalking Horse Agreement[6] | $5.0 million | $5.0 million | 100% |
| HUD / KeyBank Mortgage Note[7,9] | $110.8 million | $21.0 – $22.0 million | 19% – 20% |
| OB-GYN Realty Company, LLC First Mortgage[8] | $62,000 | $62,000 | 100% |
| Other Secured Claims[9] | $1.5 million | $1.5 million | 100% |
| NH COVID-19 Relief Loan/Grant[10] | $5.3 million | $ 0 | 0% |
| PBGC –underfunded Pension liability[11] | $13.0 million | Pension liability assumed by buyer | 100% |
| Contract cure costs including GSIE and tail costs[12] | $6.0 million | Cure costs paid for by buyer | 100% |
| General Unsecured Claims[13] | $12.0 million – $15.0 million | TBD[9] | TBD[9] |

---

[5]     Administrative expense claims could significantly increase if the closing of the transaction is delayed.

[6]     Stalking Horse Agreement contemplates the assumption of all unpaid benefit-related claims (including accrued vacation and sick time) for employees hired by the Stalking Horse Purchaser.

[7]     Recovery assumes that Stalking Horse Purchaser closes at current transaction value and is subject to the terms and conditions of the Stalking Horse Agreement.

[8]     2019 two-year 4.65% mortgage note payable in the amount of $238,000 for purchase of condo property.  The balance presented is as of August 31, 2020 and will be reduced by monthly principal and interest payments.

[9]     Other Secured Claims include property of the Debtor subject to Purchase Money Security Interests ("PMSIs") and are estimated for purposes of this analysis.

[10]     Assumes that $5.3 million loan received under New Hampshire Governor Sununu's Emergency Order No. 9 dated March 19, 2020 for the COVID-19 Emergency System Relief Fund ("CEHSRF") is converted to a grant under Coronavirus Relief Fund ("CRF") CARES Act.  If the CEHSRF loan is converted to a CRF grant prior to the close of the transaction, this class will not participate in any potential creditor recoveries.

[11]     Stalking Horse Agreement includes the assumption of the underfunded defined benefit pension liability.  The amount is estimated and will vary based on actuarial analysis related to the value of the plan assets and projected benefit obligations.

[12]     Stalking Horse Agreement includes the payment at closing   by Concord Hospital of (a) cure costs related to Assumed Contracts,, (b) amounts owed to Granite Shield Insurance Exchange ("GSIE") on account of insurance coverage for periods prior to October 1, 2020, and (c) premiums for Tail Coverage  .  The contract cure costs are estimated and will vary based on the designation and assignment of contracts to the Stalking Horse Purchaser as well as the negotiation of cure costs for assumption.

[13]     The recovery of General Unsecured Claims, other than those related to HUD / KeyBank, will be significantly affected by the ultimate purchase price, the treatment of the unencumbered assets contemplated by the Stalking Horse Agreement, and the size and determination of any secured lender deficiency claim.  The estimate presented includes trade claims, other claims not subject to priority, and claims arising out of the rejection of any executory contracts.

45.     The Debtor is evaluating whether or not to seek to confirm a plan of liquidation, however, even if it does not, the treatment of claims described above would comply with 11 U.S.C. §1129.

46.     In the Debtor's business judgment, the Sale is better for relevant stake-holders than a liquidation for several reasons. The Debtor is proposing a going concern sale to the Stalking Horse, subject to higher and better offers, that the Debtor believes will result in a sale of substantially all its assets for fair market value. Such a sale will not only benefit the pre-petition secured creditors, but also (1) patients in underserved communities, (2) priority wage claimants, who will not lose any accrued payroll benefits, (3) present vendors and executory contract counter-partier who will have continued business with the buyer, (4) the approximately 1,400 employees, the majority of whom will likely be rehired by the purchaser and will continue to have high-paying and rewarding jobs, and (5) the administrative claim holders, who will be paid in full. In the absence of a sale, the Debtor would be forced to pursue a closure plan which would result in a loss of all the aforementioned benefits, as well as a smaller (if not no) recovery for KeyBank.   This would be highly traumatic to the residents and the community; jobs would be lost, wages would likely remain unpaid and post-petition creditors would receive nothing on account of their administrative claims. The Debtor believes there are no good alternatives to the sale described above. No parties are receiving releases under the Sale.